## CONCORD *v.* CONCORD HORSE RAILROAD.

The charter of a horse railroad contained a provision that " said railroad shall be laid out by the mayor and aldermen in like manner as highways are laid out."   A single track railroad was laid out by the mayor and aldermen, without any turn-outs, but with a provision in the record of the laying out that " said horse railroad company may construct such suitable turn-outs on either side of said centre line as they may find necessary in the prosecution of the business to be done by said railroad." *Held,* that the company could not construct a turn-out, although necessary for their business, and required for the public convenience, without a laying out by the mayor and aldermen.

BILL IN EQUITY, for an injunction to restrain the defendants from constructing a side track or turn-out on Fisk street.   The first section of the defendants' charter gives them power to construct, maintain, and use a railroad, with convenient single and

double track, from any point on Main street in Concord, over, along, and upon such of the streets in said Concord as may be necessary for the public accommodation, to West Concord. The second section provides that " said railroad shall be laid out by the mayor and aldermen of said Concord in like manner as highways are laid out," etc. August 12, 1880, the mayor and aldermen laid out a single-track railroad, agreeably to the provisions and requirements of the charter, by bounds, courses, and distances, and determined that the line so described should " be the centre line of said horse railroad track; and said horse railroad company may construct such suitable turn-outs on either side said centre line as they may find necessary in the prosecution of the business to be done upon said railroad." The corporation thereupon constructed their road upon the line so laid out, and have ever since been using and operating the same. Said location passed through Fisk street.

June 1, 1888, it became necessary, in the reasonable use and operation of the railroad, to construct a side track or turn-out on Fisk street, and the defendants thereupon began constructing the same, without having made any application to the mayor and aldermen for permission to do so. Whereupon the city filed this bill, and obtained a temporary injunction restraining the defendants during the continuance of this litigation.

The construction of a turn-out or side track at the location where the defendants began constructing the same was required for the public convenience. The location was a reasonable one, and the defendants, in proceeding with such construction, were doing no unnecessary or unreasonable damage.

*H. G. Sargent,* for the plaintiffs, contended,—

1. A laying out by the mayor and aldermen of side tracks or turn-outs was required by the charter of the defendant company before they could be lawfully constructed.

2. There had been no such laying out of the turn-out on Fisk street, which the defendants were proceeding to construct when their operations were arrested by the temporary injunction.

3. Inasmuch as the mayor and aldermen could not delegate to the defendant company this public duty as to laying out, which was placed by the charter upon them, the clause in the laying out which purports to authorize the company to construct such suitable turn-outs on either side of the centre line as they may find necessary in the prosecution of the business of the railroad is of no legal force or effect whatever.

*Albin & Martin* and *Jeremiah Smith,* for the defendants. If the location by the mayor and aldermen had been silent as to the right of constructing suitable and necessary turn-outs, such right would nevertheless have existed in the defendant corporation as a necessary incident to the express legislative grant of the right to maintain

the horse railroad. It is matter of familiar knowledge, that a horse railroad cannot be conveniently and successfully operated without turn-outs, especially a railroad of such length as is authorized by this charter. The right to construct necessary turn-outs is therefore implied in the grant of the right to construct the main line. "Whoever grants a thing is supposed also tacitly to grant that without which the grant itself would be of no effect." Bro. Max. *463;—see, also, *Cushing*, C. J., in *Stevenson* v. *Wiggin*, 56 N. H. 308, 311–313.

The following *dicta* of *Agnew*, J., in a case relating to the rights of a steam railroad company, sustain this general view. "The power of the company to run its road to Pittsburgh, and to locate and construct it on Preble street, being established, it carries with it the authority to make and maintain the switches which are the direct subject of this action. By the express words of this charter the power is conferred of making as many sets of tracks as are deemed necessary. But if this were not so expressed, it is clearly to be inferred from the general powers conferred, and the essential purposes of the grant. A power to build side tracks is essential to the purpose and use of the road. A power to build a railroad of a single track, without the means of passing the trains or of leaving the track for the shifting of cars, or of repairs at the shops and yards, and without standing-room for the cars not in motion, would be clearly wanting in all that is necessary to safety, convenience, and utility, and would be vain and nugatory. This point was determined in the case of *P. W. & B. Railroad Co.* v. *Williams and wife*, already cited (54 Pa. St.103.). The essential powers of a corporation may be inferred as well as expressed" (citing authorities). *Agnew*, J., in *C. & P. Railroad Co.* v. *Speer*, 56 Pa. St. 325, 335.

The right to construct suitable and necessary turn-outs was expressly granted by the mayor and aldermen in the original location or laying out. There is no sound objection to the validity of this grant. The legislative charter authorized the construction of a railroad with "single or double track," and conferred on the mayor and aldermen plenary authority to lay out the railroad. The only special provision as to the method of laying out (except as to the matter of giving notice) was, that "they shall determine the distance at which the tracks shall be laid from the sidewalks." The latter duty has been fully performed. The centre line of the main track was located in the most definite manner. In thus determining the distance at which the main track shall be laid from the sidewalks, the board, in effect, determined also the distance at which the turn-out tracks shall be laid from the sidewalks. When they add that necessary turn-outs may be constructed "on either side said centre line," they mean, and can only mean, that turn-outs may be constructed at the same distance from the centre line at which turn-outs are usually located. Under this laying out, the railroad company cannot, under the pretence of constructing a

turn-out, construct a side track swaying further from the centre line than turn-outs usually go. Any such attempted abuse of corporate power would be judicially restrained.

It must be taken to have been the opinion of the mayor and aldermen that they had located the main track at such a distance from the sidewalks that there was room enough at any point on the entire route to put in a turn-out, without materially interfering with public travel or with the private convenience of abuttors. They, in effect, say,—" With such a location of the main line as we have just made, there is no place where a turn-out can cause serious damage. We therefore permit the company to construct turn-outs at any points where they may be found necessary, this permission being, of course, subject to the implied condition that the action of the company is taken in good faith." The turn-out is not only a mere appendage or incident to the main line, but is an incident which is necessarily limited as to its location by the location of the main line. It is not a distinct, independent enterprise, like a branch from the main line to another part of the city. A turn-out on a horse railroad must be the subject of the merest momentary use. It cannot properly be used as a depot, or as a place upon which cars could be left standing. It can be used only for the temporary purpose of permitting one car to pass another.

Under section 2 of the charter there are really only two questions left for judicial determination by the mayor and aldermen,— first, over what streets the railroad should be located; second, at what distance from the sidewalks the tracks should be laid. The railroad corporation is expressly authorized by the legislature to construct on the main route a "single or double track." Although the company preferred to begin with a single main track, yet it is entitled at any time to demand the location of a second or double track on the main route; and, as the greater includes the less, it is entitled to demand the location of a double track upon a part of the main route. The mayor and aldermen could not refuse to lay out the second main track when demanded. If they had any judicial power in the matter under section 2, it would be nothing more than determining at what distance from the sidewalks the second main track should be located. Now, according to the plaintiffs' counsel, turn-outs like the one in question " are substantially and legally, to all intents and purposes, an additional line of main track for the distance to which they extend." " The fact that they have not yet been extended the whole length of the line of single track already laid makes them no less a double track for the distance that they do extend." ". . . . . the sidings constitute a double line of track so far as they extend alongside of the main line already laid ; " and hence, the counsel argues, the provisions of section 2 of the charter relating to tracks must be held applicable to such sidings.

Assuming this view of the plaintiffs to be correct, it seems clear

that the *length* of a proposed turn-out (intended to be used in connection with the original single main track) cannot be a material matter, inasmuch as the so called "turn-out" is practically a part of a double track, and the defendants have an admitted right to have the double (or second) track located over the entire length of the main route.   In constructing a turn-out, then, the defendants, so far as length is concerned, are exercising less than their acknowledged right.   The length of the double (or second) main track is not a matter discretionary with the mayor and aldermen.   The defendants can at any time have the second track laid out in the streets where the single track now runs; and if the defendants so elect it must be laid out for the entire distance.   The mayor and aldermen can determine only at what distance from the sidewalks the second track shall be located.

If these views are correct, it follows that the distance at which the turn-outs should be laid from the sidewalks was the only point in laying out turn-outs which could call for judicial determination at the hands of the mayor and aldermen.   And our position is, that this matter of distance was practically determined with sufficient definiteness by the original laying out.   Turn-outs are usually constructed at a uniform distance from the main track (and at the same grade with the main track).   Hence, in determining the distance at which the main track shall be laid from the sidewalks, the board, in effect, determined also the distance at which the turn-out tracks shall be laid from the sidewalks.

The entire laying out shows that the expression "horse railroad track" and the expression "turn-outs" are both used as words which, *ex vi terminorum*, constitute a definite limitation of width or distance.   Thus, as to the main track, the laying out describes a definite line, as "the centre line of said horse railroad track," and does not in terms limit or describe the width of this main track.   Obviously it was understood by all parties that there is a a definite, uniform width for horse railroad tracks, and that the expression "horse railroad track" is used as signifying a track of this usual definite width.   No one has yet had the hardihood to contend that the entire laying out of the single main track is invalid for want of a limitation in express terms of the width of that track on each side of the centre line.

Equally obvious is the fact that all parties understood that there is a definite width or distance between a main single track and a turn-out; and that the expression "turn-out" is here used as describing a side track, located at this usual definite distance from the main track.

We submit that the court should take judicial notice of the fact that there is a usual definite width or distance between the main track of a horse railroad and a turn-out.

In *Phillips* v. *Detroit*, 111 U. S. 604, 606, the supreme court of the United States took judicial notice of the common method of

constructing street pavements.   In *Brown* v. *Piper*, 91 U. S. 37, 43, the court took judicial notice of the mode of constructing ice-cream freezers.   In *Terhune* v. *Phillips*, 99 U. S. 592, the court took judicial notice of the general use of a certain kind of corner sockets for show-cases.   In *King* v. *Gallun*, 109 U. S. 99, 101, 102, the court took judicial notice of the common method of sub-dividing and packing certain articles of commerce.   In matter of *Petition of Trustees, &c.*, 92 New York 116, 119, the court took judicial notice that sewers are incident to and generally found in the streets of New York city.   In *Wells* v. *Jackson Co.*, 47 N. H. 235, 261, this court took judicial notice of the common method of surveying in New Hampshire (that courses are run according to the magnetic meridian instead of the siderial meridian).   See, also, *Wiggins Ferry Co.* v. *C. & A. R. Co.*, 5 Mo. App. 347, 375.

If the matter of which the court is entitled to take judicial notice does not happen to be within the actual knowledge of the judges, they may resort to any sources of information which are deemed worthy of confidence.   " . . . . it is no objection that the court may require instruction upon the point themselves. They will make inquiries at the proper place for obtaining information." 1 Gr. Ev. (Redfield's ed., 1866) *s.* 6 *a.*   " The rule has been held, in many instances, to embrace information derived informally by inquiry from experts."   *Somerville*, J., in *Gordon* v. *Tweedy*, 74 Ala. 232—*S. C.*, 49 Am. Rep. 813, 815.   If the judge " is unacquainted with such fact," he may " refer to any person . . . for his satisfaction in relation thereto."   Steph. Dig. Ev., art. 59.

Lord *Hardwicke* made inquiry of an eminent conveyancer as to the existence of an alleged general practice among conveyancers. *Willoughby* v. *Willoughby*, 1 T. R. 772.

If, then, the usual method of constructing turn-outs does not happen to be a matter within the actual knowledge of the members of this court, the foregoing authorities justify the judges in obtaining information by inquiry of competent persons familiar with the subject.   If, however, the court prefer not to obtain information save by testimony under oath, or if the court regard the expression " turn-out" as a term of art or science which should be explained by the sworn testimony of experts, then we ask that the case may be temporarily remanded for a further hearing, at which the testimony of experts may be received to establish our position as to the meaning of that expression.

BINGHAM, J.   If the plaintiffs in this action were the owners of the fee in the land, a different question would be presented.   Then the inquiry would be whether the legislature had the constitutional power to impose on a land-holder the additional burden of the defendants' street railroad without their consent, in the exercise of the right of eminent domain.   This question has not been decided in this state, and is not free from difficulty ( *Williams* v.

*Railroad*, 16 N. Y. 97, *People* v. *Kerr*, 27 N. Y. 188) ; but the parties here are the City of Concord and the Concord Horse Railroad, each having its rights and powers given, and its duties and obligations fixed, by the legislature which gave the plaintiffs a corporate existence, and imposed upon it the duty of laying out and maintaining streets and highways sufficient for the public accommodation.    The plaintiffs held these easements as trustees for the public, subject to the control of the legislature ; but it had no fee or title in the land in this relation, as a private corporation, aside from their trusteeship for the public.    As to the plaintiffs, the legislature could create an additional facility to expedite the public travel in the plaintiffs' highways to be operated in common or jointly with those then in use, and they could make no legal objection, because they were subject to the action of the legislature in this respect.    *Wooster* v. *Plymouth*, 62 N. H. 193, 206.

The inquiries, then, are as to the meaning of the defendants' charter, how it modified or changed the plaintiffs' control of the streets, and whether the defendants were doing what they were not authorized to do when the temporary injunction was issued.

The legislature made the defendants a corporation, with power to construct, maintain, and use a railroad, with a convenient single or double track, from any point on Main street in the city of Concord, over, along, and upon such of its streets as might be necessary for the public accommodation, to West Concord, with branches and side-tracks to other parts of the city.    This grant to the defendants carried with it by implication the right to have, as a part of their railroad, such turn-outs as were necessary, though not specially named in the charter.    Section 10, however, of the charter provides that the railroad shall be laid out by the mayor and aldermen of the city of Concord in like manner as highways are laid out, and that they shall give notice to all the landholders abutting on the streets or highways through which the railroad shall pass of the time and place of hearing, as to such laying out, by publication in such of the newspapers in Concord as they may direct, fifteen days before the hearing, and they shall determine the distance the track shall be laid from the sidewalks.    Before the charter the city controlled its streets and highways, and no party had the right to construct a special track on which to carry passengers for private gain to the exclusion of the remainder of the travelling public.    The entire worked part of its streets was open alike to all.    Now the defendants are given this privilege. It however appears in other provisions of the charter that the use of the land on which the defendants' rails may be laid is not exclusive, but may be used by the travelling public when not in the actual use of the defendants, and that the mayor and aldermen have the right to direct the motive power that shall operate the railroad, and to make all such regulations as to the rate of speed and the mode of using it as the public safety and conven-

ience may require.  Laws of 1878, c. 118, ss. 4, 5, 6, 10, 11.  This proves not only a special legislative intention to preserve to the city the right to lay out, the right to authorize the operating power, to regulate the rate of speed, the mode of using, the grade at which it is to be constructed, and the right to take up the streets through which the railroad may pass, but a general legislative purpose to constitute the mayor and aldermen, as between the railroad and the general public, or abutting owners, the tribunal to decide and direct in these matters whether they arise from express grant or legal implication.  The word railroad, as used in section 2, means the railroad described and implied in section 1 in all its parts, and no exception is made in section 2 of the manner of laying out any part of the railroad described or implied in section 1, and a fair construction of the charter requires the mayor and aldermen to lay out the necessary turn-outs.

The turn-out in question, on the facts in the case, may be one that the law would now imply the right to have laid out by the mayor and aldermen; but it has not been done.  This is conceded, unless the mayor and aldermen laid it when the main track was laid in August, 1880.  What they did then was clearly not a laying out according to the charter, nor was it then understood to be a laying out.  It was not then known that a turn-out would be necessary at this point; and the most that can be claimed was an attempt by the mayor and aldermen to delegate the right to locate and construct turn-outs as they might be found necessary, which they could not do.  The injunction is made perpetual.

BLODGETT and CARPENTER, JJ., did not sit: the others concurred.

*Case discharged.*