## EATON *v.* BURKE & a.

When the question is not one of title to an office, but whether the plaintiff shall be permitted to perform its duties without interference, *mandamus* is the proper remedy.

When a later statute is so inconsistent with a former one that both cannot be in operation at the same time, the subsequent act must prevail as being the more recent expression of the legislative will, although no express words to that effect are used.

So much of *s.* 22, *c.* 1,404, Laws 1853, and of *s.* 11, *c.* 165, Laws 1878, as authorizes the city councils of the city of Nashua to elect street commissioners, is repealed by Laws 1889, *c.* 248, *s.* 1, providing for the election by the people of "a street commissioner to superintend the streets, roads, and bridges of said city."

PETITION, for a *mandamus*, requiring the defendant Burke, as mayor, and the defendants Reynolds and Farley, claiming to be street commissioners respectively of districts of the city numbered 3 and 5, to deliver to the plaintiff the tools, implements, and property of the city used in the repairing of streets, roads, and bridges, and the keys of the buildings where the tools and implements are stored, to submit to the authority of the plaintiff as street commissioner, and to cease to obstruct or hinder him in the duties of that office.

Facts agreed. At the annual election held in the city of

Nashua in November, 1889, the plaintiff was duly chosen by the people, and by general ticket, street commissioner to superintend the streets, roads, and bridges of the city, under the provisions of *c.* 248, Laws 1889; was duly notified of his election; appeared, and took the oath of office prescribed by law; and undertook to enter upon the discharge of the duties of the office, and has ever since endeavored so to do;—but the defendants have refused and still refuse to recognize his authority as street commissioner, or to deliver to him the tools, implements, and property of the city used in the making and repair of streets, roads, and bridges. The legality of the plaintiff's election as street commissioner under the statute of 1889; his formal qualification and readiness to enter upon the discharge of the duties of superintending the streets, roads, and bridges of the city; his demand for the possession of the tools and property used in the street department of the city, and the refusal of the defendants to recognize his claim or authority,— are not questioned. The defendants Reynolds and Farley claim to hold the office and exercise the authority of street commissioners respectively in districts numbered 3 and 5 in the city, by virtue of an election by the city councils prior to the passage of the act of 1889.

The defendants moved that the petition be dismissed for the following reasons:

1. The petition does not set forth any facts which will justify the court in granting the writ prayed for.

2. The controversy between the plaintiff and the defendants, as stated in the petition, involves the title to an office, and the right to exercise official privileges and discharge public duties.

3. As the controversy involves the title to a public office, or the right to exercise official privileges and discharge public duties, the court will not entertain an application for, and cannot grant a writ of, *mandamus;*—the remedy recognized by the law for determining such disputes is an information in the nature of *quo warranto,* in the name of the attorney-general.

4. Chapter 248, Laws 1889, did not repeal section 22 of the charter of the city of Nashua, nor any part of it; nor is that act inconsistent with or repugnant to said section or any part of it; nor is it inconsistent with or repugnant to any part of the charter of the city or any law of the state, but is auxiliary to and in aid of said section and of other provisions of the charter.

5. Chapter 248, Laws 1889, does not define the official powers and duties of the plaintiff as "street commissioner to superintend the streets, roads, and bridges" of the city. The right to define and limit such powers and duties is vested by the charter in the councils of the city; and until his powers and duties are defined by the city councils in an ordinance properly enacted, he has no authority to perform official acts, nor has he any legal right to the possession or custody of any of the keys or property of the city,

nor is he entitled to recognition or obedience, as an official, from either official superiors or subordinates.

6. The acts of Burke, as mayor, of which the plaintiff complains, so far as they have been performed, were authorized by the charter of the city, and were necessary and incumbent upon him in the discharge of his duties as the chief executive officer of the city; and the defendants Reynolds and Farley are, and at the time of the acts complained of were, street commissioners of districts 3 and 5, respectively, of the city; and the acts complained of, so far as they have been performed, have been authorized and were necessary in the discharge of their official duties.

*G. B. French* and *Jeremiah Smith*, for the plaintiff.

*Bingham & Mitchell* and *J. J. Doyle*, for the defendants.

SMITH, J. In 1889 the legislature established the office of "street commissioner" of the city of Nashua, the incumbent to be chosen by the people and by general ticket at the annual election in November. Laws 1889, *c.* 248. At the annual election in 1889 the plaintiff was chosen to that office, was declared elected, took the oath of office, and has been ready and willing to discharge its duties from the beginning of the present municipal year in January. There is no dispute about his election. No other person claims the office. He is prevented from entering upon and discharging his official duties by the defendant Burke, mayor of the city, and the defendants Reynolds and Farley, former street commissioners respectively of two districts in the city. He prays that they be commanded to deliver up to him the keys of the buildings, where the tools and implements used upon the streets are kept, and to quit interference with him in the discharge of his duties as street commissioner. The petition presents a question, not of title to the office, but whether the plaintiff shall be permitted to perform its duties without interference. *Mandamus* and not *quo warranto* is the proper remedy. *Kimball* v. *Lamprey*, 19 N.H. 215; *Kimball* v. *Marshall*, 44 N. H. 465; *Strong's Petition*, 20 Pick. 484; *Conlin* v. *Aldrich*, 98 Mass. 557; High Ex. Rem., *s.* 73; 2 Dill. Mun. Cor. (3d ed.) *s.* 842. *Metsker* v. *Neally*, 41 Kans. 122.

The charter of the city empowered the city councils to elect annually, among other officers, "a commissioner of streets and highways." Laws 1853, *c.* 1,404, *s.* 22. In 1878 the city councils were empowered to elect in convention, among other officers, "street commissioners." Laws 1878, *c.* 165, *s.* 11. Neither in the charter nor in the act of 1878 were the duties of the office defined, except so far as they may be inferred from the name. The city councils, after the passage of the act of 1878, divided the city into ten highway districts, and provided for the election of a "street commissioner" for each district. The ordinance provided

further, as follows: "It shall be the duty of each commissioner, under the general supervision of the mayor and aldermen, to superintend the streets, roads, and sidewalks, lanes, bridges, public walks, and squares of his district; to attend the making, widening, or alteration of the highways in the same; to cause the same to be kept in good, sufficient, and suitable repair, and to make all contracts for labor and materials that may be necessary; to superintend the building or repair of any sewers or drains therein, and to make all necessary contracts for the same, such contracts to be in all cases subject to the approval of the mayor and aldermen. The said commissioner in his district shall make all necessary arrangements for keeping the streets clear and in good order, and shall give notice to the mayor and city marshal in case of any nuisance, obstruction, or encroachment in or upon any of the streets, roads, sidewalks, bridges, public walks, or squares." Rev. Ord. Nashua (ed. 1884) *c.* 9, *s.* 1; *c.* 11, *s.* 1.    The street commissioners are authorized, under the direction of the committee on sewers and drains, to take the general care and superintendence of the sewers in their several districts, to take charge of repairs upon the same, and, with the consent of the committee, to make contracts for materials and supplies for the same. *Id., c.* 10, *s.* 3.

In the statute of 1889 the duties of street commissioner are defined. The language of the statute is, "a street commissioner to superintend the streets, roads, and bridges of said city." There is no express mention of the repeal of any former statute, nor of any statute or statutes inconsistent with its provisions. It is claimed, on the part of the plaintiff, that the former statutes are repealed by implication. The defendants contend that the act of 1889 is not inconsistent with the charter nor with the act of 1878, but is auxiliary to the same; that the duties of the office are not defined in the act; that the right to define and limit the powers of street commissioner is vested by the charter in the city councils, and until defined by ordinance the plaintiff has no authority to perform official acts and is not entitled to recognition as an officer; that the street commissioner is a subordinate officer, performing his duties under the supervision of the mayor and aldermen; and that there is no evidence that the legislature intended to effect a change in this respect. The question is thus raised whether the statute of 1889 is so inconsistent with *s.* 22, *c.* 1,404, Laws 1853, and *s.* 11, *c.* 165, Laws 1878, in relation to the election of street commissioners, that a repeal of the older statutes is necessarily implied.

By the terms "commissioner of streets and highways" (charter, *s.* 22), "street commissioners" (act of 1878), and "street commissioner" (act of 1889), are meant an officer charged with the powers and duties of highway surveyor, except as enlarged by the greater necessities of a larger municipality. The office existed in England before the settlement of this state. *Sts.* 2 and 3, P. &

M., c. 8; 5 Eliz., c. 13; 14 Car. 2, c. 6; 7 Geo. 3, c. 42; 13 Geo. 3, c. 78; Com. Dig., Chimin, C. 4; *Denniston* v. *Clark*, 125 Mass. 216, 223. Surveyors were authorized to be chosen in each town by some of the earliest acts of the province and state. 1 Prov. Papers 403; Laws N. H. 1679–1680; 1791, *p.* 180; 1805, *p.* 196; 1815, *p.* 387; 1830, *p.* 578; Rev. Sts., c. 34, s. 5; Gen. Sts., c. 66, s. 5; G. L., c. 72, s. 5. He is given authority to require each person in his list upon notice to work out his tax, to allow him for his labor, and to levy his tax by distress if the tax-payer does not attend to labor; to work out a portion of his list in another district, when necessary; to purchase materials for repairs at the expense of the town; and to remove gravel and other materials from one part of his district to another for the purpose of repairs. G. L., c. 72, ss. 7–9, 11, 13, 14, 16, 17. Except in these particulars, the powers and duties of highway surveyors are not defined by statute. The office is recognized as an ancient one, and its duties as well known and understood. In *Palmer* v. *Carroll*, 24 N. H. 314, 316, *Perley*, J., said,—"He [the surveyor] is bound under this responsibility to make necessary repairs on roads and bridges within his district. He is obliged to decide and judge at his own peril whether the repairs are necessary. His duty in this respect is not merely ministerial. It is not a defined, specific thing which he is required to do; but the law obliges him to decide for himself whether the repairs are necessary, and of course he is made the judge of that question. Within the limits of the means which the law places in his hands he is entrusted with a discretion to make such repairs as he may deem to be necessary. In this matter he has no guide but his own judgment; he does not act under the direction of any other public officer. If he exercises his best judgment faithfully and diligently, within the limits of his legal authority, the town are bound by his acts. Any other rule which would subject him, when he claims under the law repayment of the money which he has disbursed for the town, to have his best judgment revised and reversed in a mere matter of opinion, would be extremely unreasonable."

"Highway surveyors, it has been holden, are not the agents of the town. They are public officers whose duties are prescribed by law. Their authority is not derived from the town, but from the statute. They are not under the control of the town. Their powers cannot be enlarged or abridged by any action of the town, and what they do or omit to do, in the proper exercise of their authority, is done or omitted because the law enjoins and prescribes their duties, independent entirely of municipal control or authority." *Hardy* v. *Keene*, 52 N. H. 370, 377;—see, also, *Ball* v. *Winchester*, 32 N. H. 435, *Waldron* v. *Berry*, 51 N. H. 136, *Wells* v. *Goffstown*, 16 N. H. 53, *Dow* v. *Epping*, 48 N. H. 75. The town has a remedy over against the surveyor through whose fault or neglect damage happens to a traveller. G. L., c. 75, s. 10.

The provision in the city ordinances (*c.* 9, *s.* 1), that the street commissioners shall perform their duties "under the general supervision of the mayor and aldermen," so far as it subjects them to municipal control in matters over which they have discretionary authority, is in conflict with the law of the state.

The "street commissioners," whom the city councils were authorized by the act of 1878 to elect, superseded the "commissioner of streets and highways" mentioned in the charter (Laws 1853, *c.* 1,404, *s.* 22). Practically, as construed by the city councils, their duties were similar to, if not the same, as those of surveyors of highways. Rev. Ord., *c.* 9. For twenty-five years prior to 1878 they were performed by a single commissioner elected annually by the councils for the whole city. For eleven years prior to 1890 they were performed by a district commissioner, elected annually by the councils in each of the ten districts into which the councils divided the city. It must be presumed the legislature understood the situation in the city, and intended to make some change in the care of the highways, or no statute would have been passed. In giving a construction to the act of 1889, it is to be so interpreted *ut res magis valeat, quam pereat.* The legislature did not, as in 1853 and in 1878, stop with the name of the officer, but added the words "to superintend the streets, roads, and bridges of said city," intended more clearly to define his powers and duties. There cannot be two superintendents with equal powers in the same field over the same matter. The danger of collision would not only be imminent, but certain. A large force of laborers is to be employed and directed, and a large amount of tools and implements used and cared for. If the ten district commissioners can hire laborers, "superintend" the streets, have the custody and control of the tools dedicated to use upon the streets, and direct as to what work shall be done, and the time when and the way in which it shall be done, there is nothing left for the commissioner under the act of 1889 to "superintend." It is contended by the defendants that the city councils may by ordinance assign him such duties as they shall deem proper, auxiliary to the duties assigned to the district commissioners. But it is plain this cannot be done without interpolating into the statute a proviso to that effect, and there is nothing that shows the legislature intended the vitality of the statute should depend upon the consent of the city councils. Every presumption is in favor of such a construction of the legislative will, expressed in its statutes, as will prevent disorder and conflict of authority, and discourage waste.

When there are two statutes that cannot work together, we have to take one of the two, and of necessity that must be the later, because it is the later expression of the legislative will. The questions always are, (1) Were the legislature dealing with the same subject? (2) Are they inconsistent? "A later statute con-

taining provisions, though merely affirmative in form, plainly repugnant to those of a former statute, repeals it as absolutely as by a negative clause." Com. Dig., Parliament, R. 9; *New London Northern R. R. Co.* v. *Railroad*, 102 Mass. 386, 389. " When two statutes give authority to two public bodies to exercise powers which cannot consistently with the object of the legislature coëxist, the earlier must necessarily be repealed by the later statute." *Daw* v. *Metropolitan Board of Works*, 12 C. B. N. S. 161, 174. " Whenever jurisdiction of a subject-matter is transferred by statute from one existing tribunal to a new one, the original tribunal loses at once all power to originate proceedings in relation to that subject-matter. . . . This is so whether the statute repeals the law which gave jurisdiction to the original tribunal in express terms, or only by implication." *Bigelow* v. *Boston*, 123 Mass. 50. When a later statute is so inconsistent with a former one that both cannot be in operation at the same time, the subsequent act must prevail as being the more recent and authoritative expression of the legislative will, although no express words to that effect are used. *State* v. *Otis*, 42 N. H. 71, 73.

Under the act of 1889 the people cannot elect two street commissioners. It is equally clear that the city councils cannot under that act elect a street commissioner. If they cannot elect one they cannot elect ten, and they cannot do indirectly what they cannot do directly. The municipal legislature having only such power as is delegated to it by the state, cannot abolish the office, nor modify or limit its duties, nor postpone its action. A single commissioner is substituted for the ten. A revision and consolidation of the provisions of the statutes of 1853, 1878, and 1889, relating to the election of street commissioner, would show beyond doubt that they cannot stand together.

It is unnecessary to inquire what the defect was which the legislature of 1889 intended to remedy. Presumably they were of opinion that the department of streets and bridges could be more economically and intelligently managed under the superintendence of one officer, under a sense of his official responsibility, than under a system of divided responsibility.

The city councils in their legislative capacity (2 Dill. Mun. Cor. (3d ed.) *s.* 680) have the care and superintendence of the public squares and streets (charter, *s.* 20, G. L., *c.* 48, *s.* 5); may construct drains and common sewers (charter, *s.* 21, G. L., *c.* 48, *s.* 8); establish sidewalks, regulate their grade and width, remove obstructions therefrom, determine the time when and manner in which and materials of which they shall be constructed (Laws 1869, *c.* 105); may regulate the streets, public ways, squares, and the use thereof so as to prevent their being incumbered by carriages, lumber, etc. (charter, *s.* 19, *sub ss.* 10, 26, G. L., *c.* 48, *s.* 10, *sub s.* 7), and may regulate the grade of streets and sidewalks, the laying out and regulating public squares and walks, commons,

and other public grounds (charter, *s.* 19, *sub s.* 26, G. L., *c.* 48, *s.* 10, *sub s.* 14). But except so far as the city councils have the power to legislate, they cannot control the action of the street commissioner as superintendent of streets, roads, and bridges of the city; and the ordinances of the city enacted within the scope of the authority delegated to the city councils are as binding upon him as the statutes of the state.

In the mayor, aldermen, and board of common council, styled in their joint capacity the city councils, is vested the administration of the fiscal, prudential, and municipal affairs of the city. Charter, *s.* 2; G. L., *c.* 44, *s.* 3. They are a legislative body, created for the local government of the city. They are a representative body for a populous municipality, where intelligent action of all the voters in town-meeting assembled is no longer practicable. Section 2 of the charter is a statement in general terms of the nature of the government substituted for that of the town.

The executive powers of the city, and the administration of the police, to be exercised by the mayor and aldermen (G. L., *c.* 46, *s.* 14, charter, *s.* 13), if not included in or similar to the powers and duties which selectmen of towns have and are required to perform in regard to their towns, do not include powers conferred by law upon other officers.

The duties of the mayor as chief executive officer of the city (charter, *s.* 11, G. L., *c.* 45, *ss.* 5, 6), in their relation to the city, are similar to those of the governor in their relation to the state. He possesses the power of the sheriff for the purpose of preserving the peace. His power of supervision over the conduct of subordinate officers does not include the right to dictate to the city clerk what he shall record, to the inspectors of elections what names they shall place upon the lists, to the overseers of the poor what persons shall be relieved, to the school committee what teachers shall be employed or studies pursued, or generally to officers, whose duties are defined by law, how they shall perform them. The supervision which he is required to exercise is performed by causing the laws and regulations of the city to be executed by the several city officers performing their respective duties, and in case of their wilful neglect of duty, by his setting on foot the proper proceedings for their punishment. G. L., *c.* 45, *ss.* 5, 6.

*Judgment for the plaintiff.*

CLARK, J., did not sit: the others concurred.