April 2,
1929.

THE PARKER-YOUNG COMPANY AND FOX & PUTNAM *v.* STATE.

BAKER RIVER LIGHT & POWER COMPANY *v.* SAME.

552

554

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the Parker-Young Co., Fox & Putnam and E. B. Conant.

*Murchie & Murchie* (*Mr. Alexander Murchie* orally), for the Baker River Co.

SNOW, J.   The issue presented at the hearing before the commission on the petition of Parker-Young Co. and Fox & Putnam was whether the public good would be promoted by permitting the former to take over by purchase the utility business and property of the latter and to carry on the manufacture and distribution of electrical energy in the town of Woodstock.   The commission stated its conclusion as follows: "On account of the attitude taken by the public in North Woodstock and the selectmen of the town, we feel that the petition must be denied.   If it were granted, it would be ineffective unless the selectmen would grant the new owners a location for its poles in the highways.   The commission has no jurisdiction over granting these locations, that matter being entirely in the hands of the selectmen of the town.   Without such locations, the company could not render

service, and, therefore, an order from this commission permitting it to do so would be futile." It is apparent that, in the denial of the petition, controlling importance was given to the announced refusal of the selectmen of Woodstock to grant Parker-Young Co. pole locations. In the commission's report upon the later petition of Baker River Co. for like authority, the expressed willingness of the selectmen of the three towns there involved to grant that company pole locations is recited by the commission as a ground for its favorable finding, showing that like force was given to the supposed power of the selectmen to grant or withhold licenses at their pleasure. That the controlling weight accorded to the attitude of the selectmen was common to the consideration of both petitions is further shown by the fact that the commission's conclusion was expressly attributed to a rule of procedure, namely, "At the hearing on any such petition, the petitioner will be required to file certified copies of records showing that the necessary license or licenses, easement or easements to enable the petitioner to engage in business in the town or city in question have been granted." Rules of Procedure, Pub. Serv. Com. xv. The citation of this rule as the basis of its findings, as well as repeated remarks of the chairman during the course of the hearings, shows that the commission regarded a preliminary assurance of the selectmen of their favorable action as a *sine qua non* to a finding for a petitioner.

Unless selectmen of towns have power, regardless of the order of the commission, to grant or to refuse licenses for pole locations, and are bound by their advanced pledges to issue or withhold the same, there was error in the ruling which gave controlling weight to the promises and refusals of these officers. That the selectmen have no such power, and are not so bound, cannot be open to doubt.

Such powers as the selectmen have with respect to public utilities rest on P. L., *c.* 97. By this statute the erection and maintenance of poles and structures in highways for the support of electric and other wires are forbidden except upon a license from the selectmen of the town through which the proposed line is to pass locating the route thereof and fixing their size, location, etc. The selectmen are given powers to limit the duration of such license, to change the terms and conditions thereof and to revoke the license whenever the public good requires. This statute, so far as here material, is a re-enactment of P. S., *c.* 81, *ss.* 1, 2 (1891), which preceded the establishment of the public service commission. Laws 1911, *c.* 164. The provisions of P. S., *c.* 81, were designed to regulate and control the use made of highways for utility purposes so that such use may not unduly inter-

fere with the other public uses to which the highways are dedicated. *American Loan &c. Co.* v. *Company*, 71 N. H. 192, 200. It confers no express power upon the selectmen to determine who may and who may not occupy the highway with poles and wires, nor to choose between two utilities competing for the right. Any such authority which selectmen may have originally possessed under the statute arose by implication, as an incident to the general control of highway uses, and has been superseded by the express provisions of the public service commission act. Laws 1911, *c.* 164. By this act the legislature undertook by comprehensive provisions to institute a new system for the establishment and control of public utilities in the state. It created the public service commission as a state tribunal, imposing upon it important judicial duties and endowing it with large administrative and supervisory powers. Sec. 13a of the act provided as follows: "No public utility shall commence within this state the business of transmission of telephone or telegraph messages or of supplying the public with gas, electricity or water, or shall engage in such business or begin the construction of a plant, line, main or other apparatus or appliance intended to be used therein in any city or town in which at the time it shall not already be engaged in such business, or shall exercise any right or privilege under any franchise hereafter granted (or any franchise heretofore granted but not heretofore actually exercised) in such town, without first having obtained the permission and approval of the commission. The commission shall grant such permission whenever it shall, after due hearing, determine and find that such engaging in business, such construction or such exercise of the right, privilege or franchise would be for the public good and not otherwise; and may prescribe such terms and conditions upon the exercise of the privilege granted under such permission as it shall consider for the public interest." Sec. 21 provided that "All acts and parts of acts which in any way conflict with the provisions of this act are repealed so far as they do so conflict." The former section has since been retained without material modification. P. L., *c.* 240, *ss.* 21, 24.

This act clearly confers upon the commission the exclusive power, subject to appeal, to find whether the public good requires that a petitioning utility shall be permitted to engage in business and allowed to construct its lines in any city or town; and by consequence to determine to which of two or more competing utilities the grant of such rights will best subserve the public good. Like power invested in local town officers would be inconsistent with the power here ex-

pressly bestowed on the commission. Without any repealing words the later act must prevail when it is so inconsistent with an earlier one that both cannot be operative at the same time. *State* v. *Otis*, 42 N. H. 71, 73. This principle is applicable "where two statutes give authority to two public bodies to exercise powers which cannot consistently with the object of the legislature co-exist." *Daw* v. *Metropolitan &c. Works*, 12 C. B. (N. s.) 161, 174; *Eaton* v. *Burke*, 66 N. H. 306, 312. See *Opinion of the Justices*, 66 N. H. 629, 668; *Jones* v. *Railroad*, 67 N. H. 234, 238. The subsequent inclusion of both the statutes under discussion in the recodification of 1925 (Public Laws) does not change the legislative intent to be inferred from their sequence. The exclusive power of the commission is not, however, dependent upon a repeal by implication. Sec. 21, *c.* 164, Laws 1911, expressly repealed "all acts or parts of acts which in any way conflict" therewith "so far as they do so conflict." This would seem to be sufficiently broad to include any implied power that may theretofore have rested with the selectmen under P. S., *c.* 81, since the two provisions would be in manifest conflict. It is inconceivable that the legislature could have intended that the commission's permission to a public utility to do business in a given territory could be annulled by obstructive action by a local board in any one of the several towns through which the utility had been authorized to extend its lines. Such a result would defeat the apparent purpose of the legislature to provide for uniform treatment and control through a single state tribunal of utilities operating in several municipalities.

It by no means follows, however, that the duties of the selectmen are rendered perfunctory by transferring from them to the commission such incidental power as they may formerly have possessed to determine the question whether a given utility may do business in their town or what particular utility can best serve the public. It is their function to so regulate and control the use to be made of highways by any utility which may be permitted to occupy them that such use will not unduly interfere with other public uses. To the accomplishment of this end, by the proper location of the route and appliances, the powers of the selectmen remain supreme, subject only to appeal to the superior court by any party aggrieved. As suggested in argument, the situation is analogous to that with reference to street railways. The legislature or the court having decided upon the general route over which the railway can operate, the selectmen are given authority in their control of public highways to make the route specific. But this limited authority in the hands of the selectmen does not give

them authority to control or alter the decision of the fundamental question of the public good by the legislature or the body to whom the legislature has committed it. *Attorney-General* v. *Railway*, 71 N. H. 513, 515. It was there said: "In the case of a railway corporation formed under the general law (Laws 1895, c. 27), the question of the need of a railway over the general route proposed is determined by the court upon petition. This question is properly termed a 'fundamental' one in *Petition of Nashua Street Railway*, 69 N. H. 275, 276, while the laying out of the way is said to be subsidiary. The controlling consideration in the proper determination of both is the public good. When, however, the legislature grants a special charter for a railway over a route described in general terms, and empowers some other tribunal to make the route specific and definite, it does not consolidate the two questions and authorize the latter tribunal to decide both. *Concord* v. *Horse Railroad*, 65 N. H. 30, 37."

If in a given case the commission considers that the determination of the fundamental issue of the public good depends upon the petitioner's securing the grant of a particular route or pole location, and if there be doubt as to whether such route or location will unduly interfere with the other public uses to which the highway is dedicated, such doubt cannot be solved by the anticipatory promise or refusal of the selectmen with respect thereto. Whatever may be the extent of the selectmen's powers under P. L., c. 97, in the exercise of such powers the selectmen act solely in a judicial capacity, and in the performance of their judicial duties are bound to act impartially upon the evidence submitted upon any petition thereunder when it shall be presented. They may not prejudicate any issue, and cannot bind themselves by any promised action or refusal to act. *Meredith* v. *Fullerton*, ante, 124, 129, 130, and cases cited. In the supposed contingency each tribunal is called upon to perform its duty as it sees it when the issue is fairly presented to it and neither is responsible if for some legitimate reason its order is impossible of execution. The procedural rule of the commission not only reverses the logical order of proceedings but is unsound in that it requires a judicial tribunal to prejudge the merits of issues upon which it is required to keep an open mind until it is called upon to act.

It is manifest, therefore, that the finding as to the public good in each of the proceedings under consideration is based on error and therefore affords no valid basis for the orders made.

Each of the petitioning companies however contends in argument that, notwithstanding the error of law, the competent evidence con-

clusively establishes its right to an order in its behalf; the Baker River Co. asserting that it cannot be found by a clear preponderance of the evidence that the orders of the commission are unjust or unreasonable; the Parker-Young Co. claiming that, upon the evidence the finding of public good must be resolved in its favor since any other finding would be unreasonable, and that, accordingly, the cases should be remanded to the commission with instructions that its petition be granted and that of its opponent denied. Questions as to the relative powers and functions of the court and commission and of appropriate procedure are presented.

The final judgment of the court upon every appeal shall be a decree dismissing the appeal, or vacating the order complained of in whole or in part, as the case may be. P. L., c. 239, s. 18. In the perfection of a record upon which such final judgment may be made the court is invested with large discretionary powers. Primarily it has the duty of determining the validity upon the evidence of the commission's findings of the evidentiary facts upon which the justice and reasonableness of the order appealed from may depend. (*Grafton &c. Co.* v. *State*, 77 N. H. 490, 504), subject to the requirement that such findings are to be deemed to be *prima facie* lawful and reasonable. P. L., c. 239, s. 11. But if any such finding appears to be erroneous the court in its discretion may remand the case to the commission for a rehearing (*Ib.*, s. 18; *Grafton &c. Co.* v. *State, supra*, 498; *Bolger* v. *Railroad*, 82 N. H. 372, 378), or it may determine the fact according to its view of the relative weight of the evidence (*Grafton &c. Co.* v. *State*, 78 N. H. 330, 333, *Grafton &c. Co.* v. *State*, 77 N. H. 490, 506, 508); in which latter event the commission, in its further consideration of the case upon recommittal, will proceed as it would if such fact had been announced by it in the first instance. *Grafton &c. Co.* v. *State*, 77 N. H. 539, 542. If any essential fact has not been found, the case may be remanded for such finding. *Grafton &c. Co.* v. *State*, 77 N. H. 490, 498. When, however, sufficient facts have been verified or found to show that only one just and reasonable order can be made the court may so rule and remand the case to the commission for such further proceedings in accordance therewith as justice may require. *Grafton &c. Co.* v. *State*, 78 N. H. 330, 337.

So far as the cited cases afford a precedent they sanction the general practice of postponing the consideration of the evidence by the court until findings of the public good and of the necessary supporting evidentiary facts, unaffected by error of law, have been made and certified by the commission; in other words until a completed

record shall be presented upon which a final order of the court may be made either dismissing the appeal or vacating the order of the commission. P. L., c. 239, s. 18; *Grafton &c. Co.* v. *State*, 77 N. H. 490. See *Boston & Maine R. R.* v. *State*, 77 N. H. 437, 443. This course of procedure is believed to best accord with the apparent design of the legislature that the fact of the public good and the evidentiary facts upon which its determination is based should ordinarily be found in the first instance by the commission whose experience and duties particularly qualify it for the task. Such a legislative purpose is evidenced by the *prima facie* value which the statute requires this court to give to the commission's findings, and by the denial to the court of the power to vacate the commission's order or decisions (except for error of law), unless the court be convinced of their injustice or unreasonableness by a clear preponderance of the evidence. P. L., c. 239, s. 11.

The procedure, except as limited by the statute, is what justice and convenience require (*Grafton &c. Co.* v. *State*, 77 N. H. 490, 498; *LaCoss* v. *Lebanon*, 78 N. H. 413, 417), and must depend upon the circumstances of the particular case under consideration. The good of the public and not the benefit to the contending parties being the issue (*Grafton &c. Co.* v. *State*, 77 N. H. 539, 542), the desire or consent of the latter is not the test. The public, as well as the parties, is entitled to a finding of the public good on a hearing without error of law. The extent to which the error may have affected the course of the hearing, in the submission, receipt and consideration of the evidence and in the resulting findings of the commission, is the controlling factor.

A sufficient reason for remanding the present case for the refinding of the facts by the commission lies in the character of the error and its possibly far reaching effect. Here the error consisted not merely in a failure to find some essential fact, or the misfinding upon some subsidiary issue, but of a misruling which not only sustained the competency of the selectmen's negation of duty but gave thereto a controlling value upon the main issue of the public good. The official attitude of the selectmen was treated as conclusive of the rights of the parties. The hearings were conducted under a general rule of procedure by which the rights of one party were foreclosed and those of the other predetermined by the testimonial assertions of the selectmen as to their future official action. It is unimportant that the views of the commission embodied in the rule and repeated in its rulings were honestly entertained and applied. Such prominence and weight

were accorded to the rule that it is only fair to assume that the evidence upon other evidentiary facts did not receive that same fair judicial consideration which would have been accorded to them if such facts had been deemed valuable and perhaps decisive upon the main issue. Tangible proof of the effect of the error upon the other issues of fact is found in the commission's denial of the Parker-Young Co's motion for a rehearing. The motion alleged that the evidence presented at the hearing upon its petition in respect to the Baker River Co's contemplated rates had been contradicted in important particulars during the intermediate hearing on the latter's petition, and that the later evidence with respect thereto lacked definiteness; and requested an opportunity to submit evidence of a substantial difference in the respective rates proposed by the two companies. The record tends to support these claims. The denial of the motion for a rehearing and of the request to submit new evidence was put upon the ground that such "evidence . . . would in no way change or modify the facts upon which the commission based its decision." One inference which may be drawn from this statement is that no disparity of rates would overcome the refusal of the selectmen to grant pole locations and the expressed public sentiment of the people of Woodstock. While the public sentiment was a proper consideration the language of the findings indicates that the greater weight was put upon the attitude of the town officers. Except for the erroneous value and conclusive effect accorded the selectmen's evidence it seems probable that the motion for a rehearing would have been granted. The motion definitely presented an issue of material importance which appears to have had inadequate consideration because of the error of law. The requirements of the statute (P. L., c. 239, s. 11) that the findings of the commission shall be deemed to be *prima facie* lawful and reasonable and its orders and decisions final except when unjust or unreasonable upon a clear preponderance of the evidence were not intended to apply to findings which may have been thus affected by error.

The evidence offered should have been received. As such evidence, when submitted, may lead to different conclusions than would be reached on the instant report there is no occasion to pass upon the conclusiveness of the present record. The whole matter involved in the two petitions is therefore remanded to the commission for reconsideration of the evidence already submitted and for the receipt of any further evidence deemed material, and for a refinding of both the main and subsidiary facts. The latter should include "all facts which either party may request essential to the presentation of all questions

of law raised by any decision or order made." *Grafton &c. Co.* v. *State*, 77 N. H. 490, 498.

The record discloses a divergence of opinion of counsel as to the evidentiary value which should be accorded to the disparity of the rates which would be necessitated by the difference in the costs of construction under the respective plans of the two companies. As there is to be a further hearing this question has been considered.

The prayer of the Parker-Young Co. is to be allowed to do business in the town of Woodstock. Its evidence as to the cost of service was addressed to supplying the village of North Woodstock, but was accompanied with an expressed willingness to extend its lines to residents of that town so far as it is economically possible. It concedes that such extension might involve higher rates. The petition of the Baker River Co. was for the right to do business in the towns of Thornton, Campton and Woodstock, serving the country population of the Pemigewasset valley for a distance of fifteen miles including the village of North Woodstock. It seems to be conceded by both companies that if the larger territory is accommodated the additional cost of construction will necessarily call for higher rates than if service be confined to the village and administered from the Parker-Young Co. plant only two miles away. The difference in the cost of service as between the smaller and the larger development is in dispute. The Parker-Young Co. claim that this differential is so large as to make it unjust and unreasonable that the inhabitants of the village should be thus burdened for the benefit of the few and scattered settlers of the lower valley. On the other hand the Baker River Co. claim that the necessarily larger rates will not be unreasonably burdensome to such villagers.

In disposing of the Parker-Young Co's motion for a rehearing requesting an opportunity to submit evidence of a substantial difference in the proposed rates of the two companies the commission said: "As this new evidence and findings requested would in no way change or modify the facts upon which the commission based its decision denying . . . petition, a rehearing would serve no useful purpose." One interpretation of this language, as we have seen, is that the conclusive effect given to the refusal of the selectmen to grant locations rendered valueless any evidence of the disparity in rates. Counsel for Parker-Young Co., however, interpret the statement of the commission as a ruling that the determination of the question of public good was in no way dependent on the additional cost of service to the people of North Woodstock of the larger develop-

ment.  If such was the intent of the statement of the commission its ruling was in error.  The difference in the rates which the two developments would respectively impose upon the village users is clearly a material fact to be weighed with the other competent evidence addressed to the issue of the public good.  The position of the Parker-Young Co., to be inferred from its argument, that residents of North Woodstock village are entitled as a matter of right to the lesser rates and that no burden of contributing to the service of the residents of the valley as a whole can be transferred to them is equally an error.  This contention loses sight of the fact that it is not the public good of the restricted territory alone but of the valley as a whole and of all its constituent parts that is in issue.  The two petitions being considered together the perspective of the triers must necessarily include the whole valley.  Intervening municipal boundary lines are immaterial.  The people of the village and those of the valley as a whole are each entitled to have their respective needs, together with the resulting advantages and disadvantages to the other, weighed in the determination of the principal issue.  The latter have no right to accommodation which will unreasonably burden the former nor have the former a right to the lower rates incident to a service restricted to the congested area if the whole valley can be served without an unreasonable increase of their rates.  In other words, the villager has no arbitrary rights to the maximum advantage of his location nor has the isolated farmer a right to any service at all or at a common rate if it will be unduly burdensome to others.  The extent to which the maximum good of each must yield to that of the whole, and what difference in rates should bar the granting of service to the greater number, are pure questions of fact for the tribunal which for the time being is passing on the question.  Upon this issue the trier may consider the prevailing tendency of the time, supported by public policy, to equalize or apportion so far as reasonable the advantages as between rural and urban sections and to promote the growth and prosperity of the whole community involved; but against the advantage to the former must be weighed the cost to the latter, if it be substantial.  Whether such equalization or apportionment is for the public good under the circumstances is a question of fact.  The difficulties and complexity of the problem presented do not bar its solution.  Like other difficult questions of fact the issue of the public good so far as it depends upon harmonizing the conflicting rights of the communities affected must be decided by a conscientious weighing of the relative benefits and burdens which would be conferred

564

and imposed upon each by the respective developments proposed by the two competing companies.

The considerations which enter into the determination of the public good are, of course, not limited to those which have been the subject of discussion, and the failure to mention others is not to be construed as either emphasizing the relative importance of the former or as limiting the field of inquiry.

The order is

*Remanded.*

PEASLEE, C. J., was absent: the others concurred.