THE STATE, THE TRENTON HORSE RAILROAD COMPANY, PROSECUTORS, v. THE INHABITANTS OF THE CITY OF TRENTON, DEFENDANTS.

1. The charter of the city of Trenton confers power upon the common council to pass ordinances necessary and proper for the good government, order and protection of persons and property; also power to prescribe the manner in which corporations or persons shall exercise any privilege granted to them in the use of any street. *Held*, that under either of these powers reasonable regulations controlling the running of street cars may be adopted.

2. An ordinance enacting that it shall not be lawful for any horse railroad company to run any car without having an agent, in addition to the driver, to assist in the control of the car and passengers, and to prevent accidents and disturbances of the good order and security of the streets, is, upon its face, not an unreasonable regulation.

3. If an ordinance is based upon a general power, and its provisions are more detailed than the expression of power conferred, the court may look into its reasonableness. The presumption is that it is reasonable, and the burden is upon the party who denies the validity of the ordinance.

4. A grant to a corporation of the right to own property and transact business affords no immunity from any police control to which a citizen could be subjected.

On *certiorari.*

This writ of *certiorari* brings up an ordinance passed by the common council of the city of Trenton. The following is a copy of the ordinance:

"An ordinance relating to horse railroads.

"WHEREAS, it is manifest that cars adapted to carry large numbers of passengers cannot be used under the supervision of a single person with safety and convenience to the public, and a due regard to the security and good order of the streets;

" The Inhabitants of the City of Trenton do ordain :

" SEC. 1. That it shall not be lawful for any horse railroad company in the city of Trenton to run over or upon its tracks any car without having thereon an agent, in addition to the driver, to assist in the control and care of the car and its passengers, and to prevent accidents and disturbances of the good order and security of the streets.

" SEC. 2. That any company violating the provisions of this ordinance shall, for each and every such violation, forfeit and pay the sum of five dollars, to be collected according to law.

" Passed common council, August 20th, 1889."

A number of reasons are assigned for its nullification, but all the serious objections are contained in the first, second and fifth.    These reasons are the following :

Because the ordinance is in excess of the power of the common council and in excess of their corporate powers.

Because the ordinance is unreasonable.

Because it is destructive of a franchise and subversive of legislative acts.

Argued at June Term, 1890, before Justices REED and GARRISON.

For the prosecutors, *Robert S. Woodruff.*

For the defendants, *John Rellstab* and *George M. Robeson.*

The opinion of the court was delivered by

REED, J.    The prosecutors, The Trenton Horse Railroad Company, were incorporated by a special act of the legislature passed in 1859 (*Pamph. L., p.* 266), and by their charter they were empowered to construct a railroad, with the necessary turnouts, through Clinton and State streets, from the northeasterly to the westerly limits of the city of Trenton, with a branch or branches to the railroad depot, and such other

branches in the streets of said city as may be necessary. It was provided that the said road should not be constructed through any of said streets without the consent of the common council of the city of Trenton.

The act further provided for the kind of rails that were to be used and how they should be laid and designated the width of the track. The above statement included all the power and all the limitations upon that power contained in the charter, so far as they touch the question mooted.

The company presumably received the required consent of the common council, laid their tracks and are now operating their road.

I say this is so presumably because no evidence has been taken in the cause to show the present *status* of the railroad in this respect.

As already appears the question for solution is, whether the common council possessed the ability to subject the prosecutors to the expense of employing a servant, in addition to the driver, to assist in the running of each of their cars.

The charter of the city of Trenton is to be found in the laws of 1874, page 331.

On turning to its provisions, to discover the nature and scope of the powers conferred upon common council, we find, among others, the following:

Section 26 contains a general delegation of municipal police power to the common council. It confers upon that body the authority to pass such ordinances, rules, regulations and by-laws, not contrary to the federal or state laws, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health and prosperity of the city and its inhabitants.

In subdivision 7 of section 25 there is a grant of power to prescribe the manner in which corporations or persons shall exercise any privilege granted to them in the use of any street, avenue, highway or alley in said city.

In subdivision 26 of the same section there is conferred power to license and regulate cartmen, porters, hack, cab,

omnibus, milk wagons, stage and truck owners and drivers, carriages and vehicles used for the transportation of passengers and merchandise, goods or articles of any kind.

Each of these delegations of power is invoked by the defendants as a warrant for the regulation before us.

. So far as they relate to the present subject of inquiry I incline to the opinion that neither of the particular delegations of power add anything to the right to exercise the police power generally granted. No affair has been more frequently the subject of municipal regulation than the manner in which the public streets shall be used.

These regulations have been sanctioned both upon the ground of express grant of power or by virtue of the authority to make by-laws relating to the public safety and good order of the inhabitants. *Dill. Mun. Corp.*, § 326 ; *Board* v. *Heister*, 37 *N. Y.* 661 ; *Palmyra* v. *Morton*, 25 *Mo.* 593 ; *North Hudson Railway Co.* v. *Hoboken*, 12 *Vroom* 71 ; *Day* v. *Green*, 4 *Cush.* 433.

I am not asserting that neither of these special delegations may not confer power upon the common council to legislate for certain particular conditions of municipal affairs not within the general police power. But as I shall view the present ordinance, it will be regarded as a regulation of the use of a public street, and the only question considered will be, whether the regulation is reasonable in that aspect.

If it is a reasonable restraint upon a use of a highway, it needs no special delegation of power to vindicate it. If it is unreasonable, neither of the special grants validates it.

In respect to this inquiry into the reasonableness of this regulation our attention was directed to the legal rule, that where ordinances are passed in pursuance of a specific and definite power there can be no question raised in respect to its reasonableness. *Haynes* v. *City of Cape May*, 21 *Vroom* 55.

This rule is entirely inapplicable to the present ordinance. The rule is entirely settled that if any ordinance is based upon a general power, and its provisions are more specific and detailed than the expression of the power conferred, the courts

will look into the reasonableness of such provisions. *Dill. Mun. Corp.*, § 262; *Horr & B. Mun. Pol. Ord.*, § 188.

Had the legislature given the option to prescribe specific modes of using streets or to make specific regulations for stages and vehicles, no objection could be raised in respect of the reasonableness of the ordinances passed in strict conformity with the power. The presumption in favor of their validity would be conclusive. But the power conferred by the charter of the city of Trenton does not define the manner of use which the common council may require, nor the limitations within which the power may be exercised. It is a general power to regulate.

Under neither of the so-called special delegations of power could it be admitted that the common council possessed the power to enact conditions which would destroy the property and franchise of the prosecutors. There is, therefore, some restriction upon the power to fix the manner of their use of the public streets.

The only conceivable restriction is, that any such regulation must not be unreasonable. So, I shall consider the case as involving the question of the reasonableness of this regulation. This limitation of the question to be decided disposes of a point which was pressed upon the argument growing out of the corporate character of the prosecutor.

The point taken was, that the Trenton Horse Railroad Company was the owner of a franchise granted by the legislature. That by virtue of this investiture of privileges by the state, the corporation, upon an executed consent by the common council, got a right to run its cars in the streets of the city, which-right the city could not abridge or impair.

When the scope of inquiry is confined to the single question of a reasonable regulation under the police power, it will be perceived that the fact that the prosecutors is a corporation can cut no figure. A corporation, although an artificial personality, holds its property and must use it under the same liability to police control as a citizen. The title to all property is held

subject to the supreme consideration of the safety, health and comfort of the public.

An act of incorporation simply guarantees to the incorporators the right to act and do business as a corporate body, subject, of course, to the laws of the land and the legitimate control of government. *Tiedeman Lim. Pol. Pow.* 576.

In the case of *The Boston Beer Co.* v. *Massachusetts,* 97 *U. S.* 25, the franchise of the company to manufacture and incidentally to sell malt liquors was set up as a protection against a prohibitory liquor law passed by the legislature providing for the seizure of such liquors. Justice Bradley, in delivering the opinion of the Supreme Court of the United States, observed: "Although this right or capacity [to manufacture and sell] was granted in the most unqualified form, it cannot be construed as conferring any greater or more sacred right than a citizen had to manufacture malt liquor; nor as exempting the corporation from any control therein to which a citizen would be subject if the interest of the community would require it."

In the case of *The Richmond, Fredericksburg and Potomac R. R. Co.* v. *City of Richmond,* 96 *U. S.* 521, the city of Richmond had passed an ordinance prohibiting the use of engines to draw the company's cars on Broad street. The charter of the company gave them the privilege to make a railroad from some point within the corporation of Richmond, to be approved by the common council of Richmond, to some point within the corporation of Fredericksburg. The common council of Richmond approved of a certain location and the company constructed and began to operate its road. Then the ordinance mentioned was passed.

In an action involving the validity of this ordinance, it was held by the federal Supreme Court that the charter of the company gave them no vested right to run steam engines within the city of Richmond, and that it created no contract with the state. It was further held, that the ordinance was a legitimate exercise of the police power.

In the case of *North Hudson Co. Railway* v. *Hoboken*, 12 *Vroom* 71, certain ordinances touching the manner in which street railways should be laid and how the cars should be run, were brought up. Mr. Justice Depue remarked that " the legislature is presumed to have intended, when it authorized the use of the public streets for such purposes, that its grantee should hold its privileges subject to such regulations as are reasonably necessary for the common use of the streets for the purposes of a street railway and for ordinary travel."

It is obvious, therefore, that a chartered right to hold and use property does not *ipso facto* carry with it any immunity from police regulation. It is indeed true that the power of police regulation by municipal corporations over corporations is restrained within narrower limits than its power over persons. This difference does not arise from any lack of power in the legislature to exert directly, or to delegate to municipalities the power to exert the same control over each. It springs out of the circumstance, that corporations, as the creatures of legislation, have often accompanying the grant of their franchises a grant of special powers and privileges coupled with limitations upon the right of municipal interference. The municipal legislature cannot by any regulation of its own abridge the privilege thus conferred, or infringe upon the limitations thus prescribed. This is so, because the act of incorporation is a law of the state, and because any by-law which runs counter to any law, whether organic or legislative, is void. The power to regulate still exists, but in these instances the legislature itself chooses to directly exercise the power or to fix the limits within which it may be exercised by cities.

On again reverting to the charter of the prosecutor, we observe that it is silent respecting the subject matter controlled by the questioned ordinance. The right to lay its rails and, inferentially, to run cars drawn by horses over them, was granted, and when endorsed by the action of common council, became complete. The distance between the metals and the relative position of the rails with the surface of the street was defined. Respecting these particulars common council is

powerless to interfere until that portion of the charter is modified. In all other respects the company is amenable to reasonable control.

As already remarked, the manner in which public streets shall be used has ever been regarded as one of the essential objects of municipal supervision. The diverse modes in which these arteries of travel and traffic are used are calculated to give rise to clashing claims of precedence. Pedestrians, equestrians, cyclers, carriages, freight wagons, all claiming the right to use the same avenue, would be apt to jostle and create confusion, disturbance and danger. Then there are occupations of a public character disconnected from travel but essential in a city. The laying of water mains, gas pipes, erection of telegraph or telephone poles, the deposit of builders' materials, or coal and wood for domestic consumption, the stopping of wagons for delivery or loading of goods, are instances of such necessary occupations. The adjustment of all these often conflicting rights in the street and the establishment of definite rules by which each user can be apprised of the limitations upon his own right, are absolutely essential to public order and personal security.

Foremost among such regulations are those which are intended for the safety of those who use these avenues. Therefore regulative measures are essential to protect pedestrians, light vehicles against stages, steam cars, horse cars. Such a measure was an ordinance requiring stages to run through certain streets in Boston (*Commonwealth* v. *Stodder*, 2 *Cush.* 563), the court vindicating the regulation upon the ground that in narrow or busy streets they by their size might obstruct general traffic or endanger the public safety.

A limitation of the speed of steam railroad trains through and across streets to a comparatively slow rate (*Gahagan* v. *Railroad Co.*, 1 *Allen* 187), that railroad companies shall keep flagmen at dangerous crossings (*Del., L. & W. R. R. Co.* v. *East Orange*, 12 *Vroom* 127), and by-laws of a similar character, are supportable upon similar grounds. Street railways stand upon a similar footing, and are the subject of a variety of regu-

lations. It would not be disputed that ordinances would be reasonable providing for a reasonable and safe rate of speed, that lights and signals of warning shall be carried, and that sufficient brakes be employed. *Horr & B. Mun. Pol. Ord.,* § 241.

In concluding whether the ordinance under consideration is a reasonable precaution in favor of the public safety and order, we must regard it in the light of the following conditions which surround the question:

*First.* A rule of construction to be applied is, that when an ordinance is passed upon a matter clearly within a general power, the presumption is in favor of its reasonableness. The judicial power to declare it void can only be exerted when from the inherent character of the ordinance or from evidence taken showing its operation it is demonstrated to be unreasonable. *Paxson v. Sweet,* 1 *Gr.* 196.

*Secondly.* When an ordinance is attacked *in toto,* if it may operate reasonably in some instances and unreasonably in other instances, the ordinance must stand. *Pennsylvania R. R. Co. v. Jersey City,* 18 *Vroom* 286.

The ordinance only is before us. No evidence is here showing the size of the cars, the number of cars, the number of passengers carried in each car, the manner of collecting fares, the width of the streets through which the road passes, the amount and kind of travel on those streets. It was probably thought by counsel that the operation of this road in this city was so like the operation of similar roads in other cities of the size of Trenton that testimony would aid neither side. In favor of the validity of the ordinance, then, we have the right to assume the existence of those conditions in the operation of this road which we have observed in the operation of any road which would render the present regulation not unreasonable.

Now, in a city as large as Trenton, with ordinary compactness of structure, with its streets at certain times crowded with vehicles of various kinds and crossed constantly by ladies and children, place a street railway. Put upon it large cars,

heavy summer cars, which move with ease upon the metal rails with a power, a momentum, not easily checked; consider its inability to deviate from its track to avoid collision ; crowd these cars at certain periods with passengers—taking these conditions, I have no doubt of the reasonable character of this regulation. Such conditions require not only the most efficient mechanical appliances for promptly stopping the car, but almost constant attention of one man to the movement of the car and to the movement of others so as to arrest the motion of his car at a moment's warning of danger. The requirement that the person entrusted with this duty shall not have his attention diverted by the personal collection of fares, or by observing whether each passenger has deposited his fare in the trap, is certainly not an unreasonable regulation.

The *certiorari* is dismissed.