BLY, *Adm'r, v.* NASHUA STREET RAILWAY.

The statute (G. L., *c.* 269, *s.* 14) limiting the speed of riding through a street in the compact part of a town applies to a street railway corporation, although its charter provides that the mayor and aldermen of the city in which its railway is located may make such regulations as to rate of speed and the mode of use of the railway as the public safety and convenience require.

CASE, for causing the death of the intestate by negligently driving a car over him. Verdict for the plaintiff. The plaintiff's evidence tended to show that the injury was caused by a car driven by the defendants over their railway in the compact part of Nashua faster than at the rate of five miles an hour. The jury were instructed that the defendants were prohibited by *s.* 14, *c.* 269, G. L., from running their cars in the compact part of the city at a greater speed than five miles an hour; to which the defendants excepted.

*E. S. & H. A. Cutter, Robert M. Wallace,* and *Charles H. Burns,* for the plaintiff.

*George B. French* and *Burnham, Brown & Warren,* for the defendants.

CHASE, J. Does the statute providing that "No person shall ride through any street or lane, in the compact part of any town, on a gallop, or at a swifter pace than at the rate of five miles an hour" (G. L., *c.* 269, *s.* 14), apply to the defendants, whose charter provides that their "railway may be operated by such horse or other motive power as may be authorized by the mayor and aldermen" of Nashua, and that the mayor and aldermen "shall have

power to make all such regulations as to rate of speed and the
mode of use of said railway as the public safety and convenience
may require"? Laws 1885, c. 192, s. 5. The statute was enacted
in 1792, and has been reënacted in every general revision of the
laws substantially in the same form. Laws, ed. 1792, 181; ib.,
ed. 1830, 160, s. 5; R. S., c. 113, s. 13; C. S., c. 119, s. 15; G. S., c.
252, s. 14; G. L., c. 269, s. 14. Street railways were unknown in
1792. The mode of conveyance for persons then in general use
was by horseback. A gallop is a favorite gait for such riding.
But the mode of conveyance was a mere incident of the mischief
to be remedied. This consisted of the danger to which the lives
and limbs of persons using a street or lane were exposed by the
fast riding of others, whatever be the mode of conveyance. The
object of the statute was to remedy the mischief; and it was to
be accomplished by preventing fast riding generally, not fast
riding on horseback in particular. The words used are general:
"No person shall ride . . . at a swifter pace," etc. The means
of riding may be any that is in use while the statute is in force.
See *Taylor* v. *Goodwin*, 4 L. R. Q. B. Div. 228; *Williams* v. *Ellis*,
5 L. R. Q. B. Div. 175. The defendants are restrained by this
limitation the same as persons using other modes of conveyance,
unless their charter gives them a special privilege.

The charter does not give the defendants the exclusive use of
the portions of streets occupied by their tracks. If it did, there
would be ground for inferring that the legislature intended to
exempt them from the limitation, for in such case no one could
lawfully occupy a position in which he would be exposed to the
danger of collision with their cars. The public generally have a
right to use those portions of the streets, but in a manner and to
an extent modified by the use which the defendants make of them.
People may pass across or along the tracks when cars are not
passing. The rights of the public and of the defendants are in a
great measure common. *Middlesex Railroad Company* v. *Wake-
field*, 103 Mass. 261, 263; *Concord* v. *Railroad*, 65 N. H. 30, 36.
By the charter, the legislature authorized a new use of streets,
which is the source of a new and great danger to other travellers.
The driving of cars over steel or iron rails is attended with greater
danger to others using the streets than the driving of ordinary
vehicles over their uneven surfaces. As cars are heavier than ordi-
nary vehicles, and as there is less resistance to their motion, their
momentum is not so easily controlled, and causes more serious con-
sequences when they come in collision with objects. Being con-
fined to a fixed track, they cannot be turned aside to avoid collision.
They have a tendency to frighten horses, especially when propelled
by steam or electricity. The legislature were aware of these facts,
and they are competent evidence upon the question of the legis-
lative intent expressed by the charter. They show that there is
greater necessity for limiting the speed of cars than for limiting

that of ordinary vehicles. In view of this necessity it is highly improbable that the legislature intended to release the defendants from all restraint as to speed, even temporarily. If the general law does not apply to the defendants, they may drive their cars at any rate of speed, however great, until the mayor and aldermen establish regulations for their government, while a person riding upon horseback or in a carriage cannot drive across, along, or in the vicinity of their tracks at a swifter pace than five miles an hour without subjecting himself to liability to be fined or imprisoned. Such inequality would be arbitrary and unreasonable.

The speed at which the defendants may drive cars without endangering the safety of other travellers depends somewhat upon the width and character of the streets and the extent and nature of travel over them. Recognizing this fact, and the further fact that the mayor and aldermen, from their knowledge of the streets and travel, are well qualified to judge of the speed allowable within the limits of safety, the legislature delegated to them authority " to make all such regulations as to rate of speed and the mode of use of the railway as the public safety and convenience may require." *Commonwealth* v. *Temple,* 14 Gray 69, 74. This is in accordance with a policy adopted in this state when the first street railway charter was granted, and which has been generally adhered to in the enactment of later charters. Laws 1864, *c.* 3030, *s.* 5; 1878, *c.* 118, *s.* 4; 1881, *c.* 251, *s.* 4; 1889, *c.* 178, *s.* 3, *c.* 218, *s.* 4, *c.* 241, *s.* 3; 1891, *c.* 258, *s.* 5, *c.* 293, *s.* 5; 1893, *c.* 250, *s.* 4. " This control is given to these municipal officers, not as representing a conflicting interest, but as independent bodies charged with the duty of protecting the rights and promoting the convenience of the whole public." *Union Railway Company* v. *Cambridge,* 11 Allen 287, 292; *Cambridge* v. *Railroad,* 10 Allen 50, 57. The legislature intended that the mayor and aldermen should take the subject up where they left it, that is, with the general law in force and applicable to the defendants. If the mayor and aldermen find that no additional or different regulations are required, they need not act; but if they find that the public safety and convenience require that the defendants shall run their cars at a less rate of speed than five miles an hour, or that they shall take precautions of any kind to avoid injury to travellers, they are authorized to make regulations accordingly. After the adoption of regulations, the defendants would be governed by the statute as modified by the regulations. Cool. Con. Lim. 198; 1 Dill. Mun. Corp., *s.* 368; *Rogers* v. *Jones,* 1 Wend. 237; *State* v. *Welch,* 36 Conn. 215; *State* v. *Clarke,* 54 Mo. 17; *State* v. *Hayes,* 61 N. H. 264; *School District* v. *Prentiss,* 66 N. H. 145, 146.

The suggestion that this law has no more application to the defendants than the law requiring travellers meeting in a highway to turn to the right (G. L., *c.* 75, *s.* 11) has not been overlooked. It is apparent that the latter law does not apply to street railways,

for it would disable them from exercising the rights which the legislsture has granted them. *Commonwealth* v. *Temple*, 14 Gray 69, 78. But the application of the speed law to them does not have that effect. On the other hand, it produces the result in respect to street railways that it was designed to produce in re-spect to other travellers. It protects, to some extent at least, the lives and limbs of those who have occasion to use the highways in common with the railway corporations. While it cannot be supposed that the legislature intended to disable the defendants from exercising the rights granted to them by requiring them to do an impracticable thing, it is reasonable to suppose that they did intend to require the defendants to regulate the speed of their cars so as to avoid, as much as possible, the great danger caused by them to other travellers.

It is also suggested that there is the same reason for applying the speed law to steam railroads when crossing highways at grade. The law may have had such application before the enactment of *s*. 1, *c*. 965, Laws 1850, which provided that " no railroad corpora-tion shall run their engine, cars, or train across any public high-way, in or near the compact part of any town or city in this state, at a greater speed than six miles per hour." If the law of 1792 previously applied to steam railroads, this section excepted them from its operation. It imposed the same restraint upon them while crossing highways as the act of 1792 did upon travellers who use highways in the ordinary manner, except that the maximum rate of speed was six instead of five miles an hour. It was reënacted from time to time until 1889, when it was repealed, and the mat-ter was committed to the railroad commissioners for regulation. Laws 1889, *c*. 90. In the meantime an act was passed requiring railroad corporations to maintain a warning sign at every grade-crossing over a highway at which there was no gate or flagman, and to cause the locomotive whistle to be sounded and the bell to be rung when approaching crossings. Laws 1885, *c*. 98, *ss*. 1–4. In the absence of regulations by the railroad commissioners, travellers upon highways have some protection from these warn-ings. The legislation on this subject shows a disposition to impose restraints upon other occupants of highways as well as upon ordi-nary travellers, for the safety and convenience of all. It is far from being inconsistent with the view taken of the law under consideration.

It does not appear that the mayor and aldermen have made any regulations concerning the speed of the defendants' cars. They may have decided that the public safety and convenience do not require any regulation in addition to the general law. If so, there was no occasion for them to act. It was incumbent on the party alleging that they have made regulations to prove the allegation. Upon the facts disclosed in the case, the general law is applicable to the defendants the same as to other travellers.

This law was competent evidence on the question of the defendants' negligence. *State* v. *Boston & Maine Railroad,* 58 N. H. 408; *Nutter* v. *Railroad,* 60 N. H. 483; *Clark* v. *Railroad,* 64 N. H. 323; *Wright* v. *Railroad,* 4 Allen 283; *Hanlon* v. *Railroad,* 129 Mass. 310.

*Exception overruled.*

CARPENTER and WALLACE, JJ., did not sit: the others concurred.