PEOPLE *v.* DETROIT UNITED RAILWAY.

1. STREET RAILWAYS—DEFINITION—PRIVATE RIGHT OF WAY.
    A railway company operating its line on a private right of way cannot be said to be a street railway company in the ordinary meaning of that term.

2. SAME—MUNICIPAL CORPORATIONS — REASONABLE REGULATION — POLICE POWER.
    Municipal regulations of the use of streets by a street railway are an exercise of the police powers of the city, and will be upheld if reasonable.

3. SAME—ORDINANCES.
    An ordinance of the city of Detroit requiring "all cars carrying passengers operated upon any line of street railroad" in said city to "come to a full stop immediately before crossing any street or avenue in said city whenever signaled to stop by any person desiring to take passage thereon or to alight therefrom," *held,* not unreasonable.

Certiorari to recorder's court of Detroit; Jeffries, J. Submitted June 10, 1919. (Docket No. 102.) Decided July 17, 1919.

The Detroit United Railway was convicted of violating an ordinance of the city of Detroit, and sentenced to pay a fine of $50. Affirmed.

*Bernard F. Weadock,* for appellant.

*Clarence E. Wilcox,* Corporation Counsel, **and** *Thomas P. Penniman* and *Paul T. Dwyer,* Assistants Corporation Counsel, for the people.

MOORE, J. This is certiorari to review the finding of defendant guilty of violating a city ordinance. We quote sufficiently from the opinion of the trial judge to indicate the questions involved as follows:

"This is a complaint against the Detroit United Railway charging a violation of a city ordinance on the 11th day of September, 1917, in that it did not stop its cars at the crossing or intersection of Woodward avenue and Chamberlain avenue in the city of Detroit when hailed and signaled so to stop by certain persons who desired to become passengers thereon, one such person being T. Frank Hooley, the complainant in this case.

"The city ordinance of the city of Detroit, chapter 245, section 19-*a*, page 600 of the Compiled Ordinances of the city of Detroit of 1912, provides as follows:

"'SEC. 19-*a*. All cars carrying passengers operated upon any line of street railroad in the city of Detroit shall come to a full stop immediately before crossing any street or avenue in said city whenever signaled to stop by any person desiring to take passage thereon or to alight therefrom; and all cars operated on any such line or lines shall be brought to a full stop before crossing any street or avenue at which any two lines of street railway intersect.'

"The court finds the facts in this case to be,

"*First*, that the Detroit United Railway, the defendant herein, owns and operates a street railway line running over the streets and avenues within the limits of the city of Detroit, and especially upon Woodward avenue and across and by Chamberlain avenue where it intersects Woodward avenue as described in this complaint. That for some time the intersection of Woodward avenue and Chamberlain avenue, as above described, and where complainant stopped and hailed said car has been a regular stop marked by the company with a sign indicating that it was a proper place for its cars to stop, to take on and let off passengers.

"*Second*, that the complainant on the day mentioned in the complaint was at the said intersection of Woodward and Chamberlain avenues as above described, and hailed or signaled for the stopping of car number ——, operated by the said railway company, and that the said car refused to stop upon the signal and hailing of the said complainant.

"*Third*, that Chamberlain avenue intersecting Woodward avenue, the point mentioned in said complaint,

is in the city of Detroit, and within the provisions of the said ordinance.

"*Fourth*, that this part of the city has greatly developed in the past few years, and within it are hundreds of families requiring the service of the said street railway company, and that the local service rendered by the said company is inadequate; that while there is local service on said line on Woodward avenue at the intersection of Chamberlain avenue, this is very frequently changed to limited service where the cars run by, and refuse to stop for passengers at said point, at such times rendering local service wholly inadequate. That people are required to walk from twelve to fifteen hundred feet across some three or four other street crossings intersecting Woodward avenue to get cars marked 'limited' run by said company on said streets; and in a modern city in keeping with the desire and necessity for rapid transit, such distances to walk to take a car are an unreasonable burden upon the public.

"*Fifth*, that Hooley is a resident of Royal Oak, and that when attempting to take the car mentioned in said complaint, he was about to go to his residence in Royal Oak, beyond the city limits, and that Chamberlain avenue intersecting Woodward avenue, as described in the complaint was a proper place under the ordinance of the city of Detroit to wait and board said cars, either local or limited for transportation, either in or outside of the city of Detroit.

"There is no evidence in this case to indicate that the section of the said ordinance providing for the stopping of cars in and upon the streets of the city of Detroit is unreasonable. In fact, the ordinance has stood for many years, and this is the first time it has ever been questioned by the defendant which has been operating cars in the city of Detroit for a great number of years. There is nothing in the original grant to the Detroit United Railway over the property described in the complaint before becoming part of the city of Detroit, to indicate any limitation upon the powers of the city of Detroit, to regulate its traffic within the city limits, as here sought by said ordinance.

"It was indicated in the argument of counsel that

207—Mich.—10.

the stopping of limited cars at street crossings in the city of Detroit as designated by the city ordinance, is a burden upon express or rapid transportation, and that people outside of the city of Detroit are entitled to the use of rapid transit as well as those who live within the city limits. If this contention is right, then the Detroit United Railway may mark all of its cars or any number of its cars "express" and may run them from one central part of the city of Detroit through the entire city, across any number of streets, without stopping to take on or let off passengers. It is just as much a convenience for a passenger to be able to take a limited car at convenient places upon the streets of the city of Detroit, as it is that they should have rapid transit from a certain point of the city to the city limits.   *   *   *

"Therefore this court finds that it is such a convenience to the public of the city of Detroit, for passengers coming in and going out of this city to other parts of the State to have the convenience of boarding these cars, either local or limited, at such street or avenue as they may be conveniently at.

"Therefore I find this defendant guilty and the sentence of the court is that it be fined the sum of fifty dollars."

Testimony on the part of the defendant indicates as follows:

"Summary of cars operated on respective dates.
July 31st.

| | | |
|---|---|---|
| North bound...86 Locals | 9 Limiteds | 30 Expresses |
| South bound...86 Locals | 9 Limiteds | 27 Expresses |

August 13th.

| | | |
|---|---|---|
| North bound...82 Locals | 9 Limiteds | 34 Expresses |
| South bound...88 Locals | 9 Limiteds | 26 Expresses |

August 17th.

| | | |
|---|---|---|
| North bound...82 Locals | 9 Limiteds | 30 Expresses |
| South bound...84 Locals | 9 Limiteds | 28 Expresses |

August 22d.

| | | |
|---|---|---|
| North bound...81 Locals | 9 Limiteds | 26 Expresses |
| South bound...89 Locals | 9 Limiteds | 27 Expresses |

August 28th.

| | | |
|---|---|---|
| North bound...54 Locals | 9 Limiteds | 29 Expresses |
| South bound...69 Locals | 9 Limiteds | 30 Expresses |

September 17th.
North bound...88 Locals   9 Limiteds   40 Expresses
South bound...92 Locals   9 Limiteds   36 Expresses"

Only local cars were stopped at Chamberlain street intersection.

The counsel for defendant presents many contentions. Those requiring consideration here are stated in the brief of counsel as follows:

"This respondent maintains that such ordinance is unreasonable, invalid and inoperative in the present instance as a matter of law.   Because

"(*a*)  The ordinance is not a proper exercise of the police power.

"(*b*)  The city is without express or implied authority for its enactment.

"(*c*)  The ordinance is not of such a character as to be embraced within the police power of the city.

"(*d*)  The ordinance is contrary to the public policy of the State.

"(*e*)  The enforcement ordinance deprives the respondent of its property without due process of law and is violative of the Constitutions of the United States and State of Michigan.

"(*f*)  The ordinance is an interference with interstate commerce.   *   *   *

"Being a common carrier with the duties to perform as stated above it is empowered by common law to make and enforce all reasonable rules and regulations that may be necessary to best serve the public, meaning by public, the whole public, not a part or parcel but the public in its entirety.

"The operation of the cars in question is an exercise of an obligation which cannot be either put aside by the company nor destroyed by a part of the public. (Citing authorities.)   *   *   *

"It is the contention of this respondent that the establishment of the express and limited service by rule and regulation is a subject within its province as a carrier and is presumed to be reasonable until conclusively proven otherwise.   In the instant case it is shown that this locality has more express stops than

any other along the line. The testimony shows that there is an express stop approximately 1,300 feet to the north and also approximately 1,200 feet to the south. These distances do not exceed two city blocks. The express cars operate on a thirty-minute headway, and the local cars on a thirty-minute headway, except during certain hours of the day when the service is more frequent so that at the mile roads the combined service is fifteen minutes and better."

Counsel insist that *Township of Ross* v. *Railways Co.,* 165 Mich. 28, is controlling. A reference to that case will show it was a mandamus proceeding where the field of operations was a sparsely settled village and not a great city.

An examination of the authorities cited by counsel for appellant show that nearly all of them relate to the operation of steam railroads and are not applicable here. The case cited by defendant of *Village of Excelsior* v. *Railway Co.,* 108 Minn. 407 (122 N. W. 486), is more in point. The railway company, however, was operating its line on a private right of way and cannot be said to be a street railway company in the ordinary meaning of that term. Counsel also cite *Residents of Albany* v. *Schenectady R. Co.,* P. U. R. 1916C, 62. That case did not involve the violation of an ordinance.

The following appears in 28 Cyc. p. 727:

"Municipal regulations of the use of streets by a street railroad are an exercise of the police powers of the city and will be upheld if reasonable. The power of municipalities to regulate the running of cars or railways, standard, street, or interurban, within the corporate limits has been sustained by numerous decisions."

The ordinance in the instant case appears in that part of the opinion of the trial judge which we have quoted. Section 28 of article 8 of the State Constitution reads:

"No person, partnership, association or corporation operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any city, village or township for wires, poles, pipes, tracks or conduits, without the consent of the duly constituted authority of such city, village or township; nor to transact a local business therein without first obtaining a franchise therefor, from such city, village or township. The right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships."

There is nothing in the record to indicate that the common council for the city of Detroit has been asked to except from the provisions of the statute inter-urban cars.

In 36 Cyc. p. 1458 appears the following:

"As to movement and speed of cars. It is also within the power of the legislature or municipal government to make reasonable regulations relative to the movements of street cars, as by requiring cars to stop at specified places, such as before crossing intersecting streets; or before reaching a railroad crossing, and not to proceed until it has been ascertained that the way is clear."

In *Bly* v. *Railway,* 67 N. H. 474 (32 Atl. 764, 30 L. R. A. 303), the court used the following language:

"The charter does not give the defendants the exclusive use of the portions of streets occupied by their tracks. If it did, there would be ground for inferring that the legislature intended to exempt them from the limitation, for in such case no one could lawfully occupy a position in which he would be exposed to the danger of collision with their cars. The public generally have a right to use those portions of the streets, but in a manner and to an extent modified by the use which the defendants make of them. People may pass across or along the tracks when cars are not passing. The rights of the public and of the defendants are in a great measure common. *Middlesex Railroad Co.* v. *Wakefield,* 103 Mass. 261, 263; *Concord* v. *Railroad,*

65 N. H. 30, 36 (18 Atl. 87). By the charter, the legislature authorized a new use of streets, which is a source of a new and great danger to other travelers. The driving of cars over steel or iron rails is attended with greater danger to others using the streets than the driving of ordinary vehicles over their uneven surfaces. As cars are heavier than ordinary vehicles, and as there is less resistance to their motion, their momentum is not so easily controlled, and causes more serious consequences when they come in collision with objects. Being confined to a fixed track, they cannot be turned aside to avoid collision. They have a tendency to frighten horses, especially when propelled by steam or electricity. The legislature were aware of these facts, and they are competent evidence upon the question of the legislative intent expressed by the charter. They show that there is greater necessity for limiting the speed of cars than for limiting that of ordinary vehicles. In view of this necessity it is highly improbable that the legislature intended to release the defendants from all restraint as to speed, even temporarily. If the general law does not apply to the defendants, they may drive their cars at any rate of speed, however great, until the mayor and aldermen establish regulations for their government, while a person riding upon horseback or in a carriage cannot drive across, along, or in the vicinity of their tracks at a swifter pace than five miles an hour without subjecting himself to liability to be fined or imprisoned. Such inequality would be arbitrary and unreasonable.

"The speed at which the defendants may drive cars without endangering the safety of other travelers depends somewhat upon the width and character of the streets and the extent and nature of travel over them. Recognizing this fact, and the further fact that the mayor and aldermen, from their knowledge of the streets and travel, are well qualified to judge of the speed allowable within the limits of safety, the legislature delegated to them authority 'to make all such regulations as to rate of speed and the mode of use of the railway as the public safety and convenience may require.' Commonwealth v. Temple, 14 Gray (Mass.), 69, 74. This is in accordance with a policy

adopted in this State when the first street railway charter was granted, and which has been generally adhered to in the enactment of later charters. Laws 1864, chap. 3030, § 5; 1878, chap. 118, § 4; 1881, chap. 251, § 4; 1889, chap. 178, § 3, chap. 218, § 4, chap. 241, § 3; 1891, chap. 258, § 5, chap. 293, § 5; 1893, chap. 250, § 4. 'This control is given to these municipal officers, not as representing a conflicting interest, but as independent bodies charged with the duty of protecting the rights and promoting the convenience of the whole public. *Union Railway Co.* v. *Cambridge,* 11 Allen (Mass.), 287, 292; *Cambridge* v. *Railroad Co.,* 10 Allen (Mass.), 50, 57. The legislature intended that the mayor and aldermen should take the subject up where they left it, that is, with the general law in force and applicable to the defendants. If the mayor and aldermen find that no additional or different regulations are required, they need not act; but if they find that the public safety and convenience require that the defendants shall run their cars at a less rate of speed than five miles an hour, or that they shall take precautions of any kind to avoid injury to travelers, they are authorized to make regulations accordingly. After the adoption of regulations, the defendants would be governed by the statute as modified by the regulations. Cooley Const. Lim. p. 198; 1 Dillon, Mun. Corp. § 368; *Rogers* v. *Jones,* 1 Wend. (N. Y.) 237; *State* v. *Welch,* 36 Conn. 215; *State* v. *Clarke,* 54 Mo. 17; *State* v. *Hayes,* 61 N. H. 264; *School District* v. *Prentiss,* 66 N. H. 145, 146 (19 Atl. 1090)."

The case of *Cape May, etc., R. Co.* v. *City of Cape May,* 59 N. J. Law, 404 (36 Atl. 678, 36 L. R. A. 657), involved the violation of an ordinance similar to the one before us. In disposing of the case the court used the following language:

"The power therefore is undoubted to make reasonable regulations to reasonably control the operation of electric street railway cars, within the city, in many respects. *Trenton Horse R. Co.* v. *Trenton,* 53 N. J. Law, 132 (20 Atl. 1076, 11 L. R. A. 410). The power to reasonably regulate the operation of these street railways is implied from the authority conferred upon the city council by the city charter.

"The franchise or privilege is granted by the municipality, and a reasonable regulation of the enjoyment of the franchise is not a denial of the right; for corporations which are to be regarded as inhabitants of a city are subject to its ordinances to the same extent as natural persons. The power is a police power, and one which is constantly exercised in prescribing regulations for the good of the community, and such regulations can be enacted by the legislative body of the municipality without notice to the parties who may claim to be interested, provided the regulations are made according to and in the manner prescribed by, the charter of such municipality. The exercise of this power is legislative in its character. *Trenton Horse R. Co.* v. *Trenton, supra; Consolidated Traction Co.* v. *City of Elizabeth,* 58 N. J. Law, 619 (34 Atl. 146, 32 L. R. A. 170) ; *Frankford, etc., R. Co.* v. *City of Philadelphia,* 58 Pa. St. 119; *North Hudson County R. Co.* v. *Mayor, etc., of City of Hoboken,* 41 N. J. Law, 71; Booth, St. Ry. Law, § 222.

"Ordinances passed by virtue of an implied power conferred upon municipal corporations must be reasonably consonant with the general powers and purposes of the corporation, and not inconsistent with the laws or policy of the State. 1 Dillon, Mun. Corp. (4th Ed.) § 319. There is much discretion left to the municipal corporation in the exercise of their general and implied powers, and the exercise of this authority will not be judicially interfered with unless its exercise has been manifestly unreasonable and oppressive, and is an invasion of private rights. No private right is invaded by the ordinance in question, and the presumption is in favor of its validity. The unreasonableness of the ordinance is not apparent on its face, and the burden of proof is on the prosecutor to show wherein it is arbitrary, unjust or oppressive. Booth, St. Ry. Law, § 224, and cases cited in notes.

"Regulations may be made requiring street railway cars to stop at designated places, in order to accommodate passengers and prevent unnecessary obstructions to public travel, as well as to avoid danger of accidents to others in the ordinary use of the streets and other public places. *North Birmingham St. R. Co.* v. *Calderwood,* 89 Ala. 247 (7 South. 360). Street railways are a great public convenience, and they are

to be properly protected in the exercise of their franchise; but they are not entitled to a monopoly of the street, nor even to the exclusive use of that part covered by their tracks. They must exercise their rights in harmony with the rights of the traveling public.

"The ordinance in question is presumed to be a valid ordinance. It does not appear on its face to be unreasonable or oppressive under the circumstances of the case. Neither does it otherwise appear in purpose or effect to be unreasonable. Electric street railway cars can be propelled at a very rapid rate of speed along the streets and over the crossings and intersections thereof, and other public places, with great danger to those using such crossings. In view of these dangers, incident to the operation of this class of street railways, it is incumbent upon the companies owning and operating them to exercise a degree of care and caution to avoid accidents commensurate with the risks involved. This degree of care is a reasonable one in view of the probabilities of danger, and the exercise of this care for the protection of the general traveling public can be enforced by ordinance. A regulation that the cars shall stop at every street before crossing is a reasonable one, which does not interfere with the franchise of the prosecutor, and would appear to be necessary to protect the public from the dangers incident to the crossing.

"The proceedings of the city council and the ordinance must be affirmed with costs."

In the case before us the defendant is found guilty of violating an ordinance of a great city having from three-quarters of a million to a million of people. The trial judge found as a fact that the service at the point indicated was inadequate to properly serve the public. Woodward avenue is one of the great arteries of this large and growing city. The summary of the frequency of the running of the street cars which we have before stated gives some idea of its congested condition. We may well take notice that even more passengers are conveyed up and down and across Woodward avenue in automobiles than find transit in the street cars.

Counsel for defendant insist these large interurban cars should be allowed to make runs of a half mile or more without stopping and to cover more mileage in a given time than the ordinary street car. The common council might well regard the doing of this as a menace to the rights of others who have equal rights upon the street with the defendant.

The municipal authorities are in a situation to know local conditions much better than are the courts, and while we should not hesitate to declare an ordinance unreasonable if it was shown that it was clearly so, we think upon this record we should decline to so hold.

The judgment is affirmed, with costs.

BIRD, C. J., and OSTRANDER, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.